HIGGINSON, Circuit Judge:
A jury found Jose Julian Andaverde-Tiñoco guilty of illegal reentry subsequent to removal after conviction of an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b). The district court sentenced him to 70 months of imprisonment and three years of supervised release. It also revoked a previously imposed term of supervised release and sentenced him to eight months of imprisonment, four months of which were to run consecutively and four concurrently to the 70-month sentence, for a total of 74 months. He appeals. For the reasons that follow, we AFFIRM his conviction and sentence.
*514 I.
On March 9, 2011, United States Border Patrol agent Carlos Ortega observed four individuals attempting to make their way-north from the Rio Grande. Ortega called two other agents, Luis Garza and Ernest Granado, to the scene. The agents detained and handcuffed the individuals, including Defendant-Appellant Jose Julian Andaverde-rTiñoco (“Andaverde-Tiñoco”). According to Andaverde-Tiñoco’s testimony on cross-examination, the agents read him his Miranda rights in Spanish while in the field.
Granado transported the individuals by car to a nearby Border Patrol station. Granado testified that, during the ride, one of Andaverde-Tiñoco’s companions said that the companions had been “beaten and robbed” on the Mexican side of the river but did not specify when or where that had happened or mention anything about being forced to cross the river. Granado also testified that there were no marks or indications of recent physical abuse on any of the individuals. Granado did not follow up on this information, pass it along to the other agents, or write any report.
At the station, the four companions were processed, and the other three were granted voluntary returns to Mexico. Andav-erde-Tiñoco was not eligible for a voluntary return because of his criminal and immigration history, so he was processed as a criminal alien. Agent Eron Hernandez testified that he interviewed Andav-erde-Tiñoco at the station and that the first thing he did was read Andaverde-Tiñoco his Miranda rights in Spanish. A written record of the interview — which Hernandez prepared and Andaverde-Tiño-co read, approved, and signed — showed that Andaverde-Tiñoco admitted that he was a Mexican citizen, that he had entered the United States on March 9, 2011 by swimming across the Rio Grande, that he had previously been deported or removed from the United States and never applied for permission to return, and that he did not fear any persecution or torture if he were to be removed to Mexico. According to Hernandez’s testimony, Andaverde-Ti-ñoco did not mention that he had been robbed on the other side of the Rio Grande, nor did other agents mention to Hernandez that any of Andaverde-Tiño-co’s companions had claimed to have been robbed.
A one-count indictment charged Andav-erde-Tiñoco with illegal reentry subsequent to removal after conviction of an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b). The government also moved to revoke a previously imposed term of supervised release that resulted from a prior illegal-reentry conviction.
At trial, Andaverde-Tiñoco stipulated to the elements of the offense, yet presented the defense that he reentered under duress and hence was not criminally responsible for his actions. Andaverde-Tiñoco called border agent David Montoya, who testified that he had interviewed the other individuals and that one of them had said they had been robbed before crossing. Andaverde-Tiñoco testified and described how, on the day of the arrest, he and three friends were driving in Mexico when armed men stopped them and robbed them of their vehicle and money. He further testified that the men brought him and his friends to the river and told them to cross or be shot, that he begged the men not to make him cross because he would be sent to prison, and that he crossed the river because he felt he had no choice. He admitted that he did not mention the robbery when initially detained or during transport to the station, but then he stated that he told the agents about the robbery while they fingerprinted and interviewed *515 him and that the agents did not write anything down or record the conversation.
Approximately two hours after starting deliberations, the jury sent a note stating that the jurors were deadlocked at a six-to-six vote. The district court proposed that it give an Allen charge to the jury. Andaverde-Tiñoco objected — arguing that the jurors had not been deliberating for long, the trial was short, and most of the evidence was uncontroverted — and requested a mistrial. The district court overruled the objection, denied the motion for a mistrial, and sent the Allen charge to the jury. Approximately two-and-a-half hours after receiving the charge, the jury found Andaverde-Tiñoco guilty.
At sentencing, Andaverde-Tiñoco attempted to present an affidavit of Daniel Reyna Flores, one of his companions on the night of the arrest, who corroborated most of his story. The government objected. The district court refused to admit the affidavit because it was hearsay, but allowed the investigator who obtained the affidavit to testify as to some of the statements Reyna Flores made to him, including that he had been forced across the river. Andaverde-Tiñoco pleaded “true” to the facts alleged in the petition for revocation of supervised release. The district court sentenced him to 70 months of imprisonment and three years of supervised released. It also revoked the previously imposed term of supervised release and sentenced him to eight months of imprisonment, four months of which were to run consecutively to the 70-month sentence, for a total of 74 months. Andav-erde-Tiñoco timely appealed the conviction and sentence.
II.
Andaverde-Tiñoco argues first that the district court abused its discretion by giving an Allen charge to the jury. The relevant inquiry on appeal is whether: (1) any semantic deviation from approved Allen-charge language was so prejudicial that it requires reversal and (2) the circumstances surrounding the use of the charge were coercive. United States v. Winters, 105 F.3d 200, 203 (5th Cir.1997). Generally, we review the use of an Allen charge for abuse of discretion. Id. Where a defendant does not object to its use, review is for plain error. United States v. Hitt, 473 F.3d 146, 153 (5th Cir.2006). The government argues that Andaverde-Tiñoco’s objection to the charge in the district court failed to preserve his challenge on appeal. “A party must raise a claim of error with the district court in such a manner so that the district court may correct itself and thus, obviate the need for our review.” United States v. Gutierrez, 635 F.3d 148, 152 (5th Cir.2011) (internal quotation marks and footnote omitted). “[T]he touchstone is whether the objection was specific enough to allow the trial court to take testimony, receive argument, or otherwise explore the issue raised.” United States v. Burton, 126 F.3d 666, 673 (5th Cir.1997).
Andaverde-Tiñoco objected to the Allen charge as follows:
As the Court is aware, this is a very short trial. Most of it was completely uncontroverted. The controverted evidence is extremely short, and the fact that the jurors already said that they couldn’t reach a verdict and they’re divided numerically six to six, your Honor, I believe an Allen charge would not be appropriate at this time, and we ask for a mistrial.
Andaverde-Tiñoco cites United States v. Montalvo, 495 Fed.Appx. 391, 392 n. 2 (5th Cir.2012) (unpublished), to argue that a general objection to an Allen charge that does not mention the language itself is *516 sufficient to preserve that issue for appeal. However, our unpublished Montalvo decision is inapposite. There, although the government argued that Montalvo had not objected to the language of the Allen charge, Montalvo himself did not make the language argument on appeal. Thus, the court looked only to the circumstances of the charge, an objection that the court found Montalvo had adequately made below. Id. at 392-93 & n. 2; cf. Hitt, 473 F.3d at 153 & n. 5 (reviewing for plain error where defendant objected to charge in toto but not to language specifically); United States v. Hill, 334 Fed.Appx. 640, 645 (5th Cir.2009) (unpublished) (reviewing language for plain error where objection to charge did not include objection to its language). The objection does not reference the language of the charge, so the district court “could not have understood,” Gutierrez, 635 F.3d at 152, that Andaverde-Tiñoco wanted additional or adjusted language included in the charge, particularly because the district court used the language from the then-applicable Fifth Circuit Pattern Jury Instructions. Fifth Cirouit Pattern Jury Instructions (CrimiNal), § 1.45 (West 2001). However, the objection does directly address the coerciveness of the charge under the circumstances and thus preserves that issue for appeal. Therefore, we review the language of the charge for plain error and the use of the charge for abuse of discretion.
A.
Under the first prong of the Allen analysis, we inquire whether any semantic deviation from approved Alien-charge language was so prejudicial that it requires reversal. Winters, 105 F.3d at 203. As stated above, we review the language of the charge in this case for plain error. To prevail under plain error, an appellant must show a forfeited error that is clear or obvious and that affects his substantial rights. Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). If he makes such a showing, we have the discretion to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. In reviewing jury instructions, “plain error occurs only when the instruction, considered as a whole, was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice.” United States v. Garcia, 567 F.3d 721, 728 (5th Cir.2009) (internal quotation marks and citation omitted).
Here, the language of the modified Allen charge was almost identical to the charge found in the then-applicable 2001 Pattern Jury Instructions, a fact we previously have noted in upholding Allen charges. See United States v. Allard, 464 F.3d 529, 536 (5th Cir.2006). The only modification was the addition of a sentence that reminded the jury not to reveal the exact numerical breakdown of its voting, an addition that Andaverde-Tiñoco' does not challenge. Instead, Andaverde-Tiñoco argues that the charge was unbalanced because it focused on the government’s burden of proof on the elements of the illegal entry offense, which Andaverde-Ti-ñoco had conceded, and did not address his burden of proof on the duress defense.
The failure to include additional language about the duress defense was not a clear or obvious error. Andaverde-Tiñoco acknowledges that the charge was equivalent to the then-applicable pattern instruction. The cases that Andaverde-Tiñoco cites do not stand for the proposition that failure to include additional language in an otherwise-approved pattern instruction constitutes error.
Even if he had shown a clear or obvious error. Andaverde-Tiñoco has not shown *517 that the failure to include language about his duress defense affected his substantial rights. To make that showing, he must “demonstrate that the error affected the outcome of the district court proceedings.” United States v. Broussard, 669 F.3d 537, 553 (5th Cir.2012). Because Andaverde-Tiñoco stipulated to the offense,[1] his theory for why the jury should find him not guilty become only his affirmative duress defense. The Allen charge asked the jurors who believed Andaverde-Tiñoco was guilty to reconsider this conclusion in light of the fact that other jurors believed him to be not guilty. The Allen charge also instructed the jurors to follow their initial instructions, which included the duress defense, and we presume that jurors follow their instructions. See, e.g., United States v. Turner, 674 F.3d 420, 430 (5th Cir.2012). Finally, the jury deliberated for more than two hours after receiving the Allen charge, presumably on the duress defense because that was the only issue at trial. For these independent reasons, Andaverde-Tiñoco has not shown that the district court plainly erred in the language of the Allen charge.
B.
Under the second prong of an Allen-charge analysis, we inquire whether the circumstances surrounding the use of the charge were coercive. Winters, 105 F.3d at 203. We evaluate the “totality of the circumstances” surrounding the use of the charge in assessing its coercive effect. United States v. Lindell, 881 F.2d 1313, 1321 (5th Cir.1989). The district court has “broad discretion to evaluate whether an Allen charge is likely to coerce a jury into returning a verdict it would not otherwise return.” Allard, 464 F.3d at 536 (internal quotation marks and citation omitted). As stated above, we review the use of the charge in this case for abuse of discretion.
Andaverde-Tiñoco argues that the use of the Allen charge after approximately two hours of deliberations “sent a strong message that failure to reach a verdict was not an option”; that the jury received the charge close to midday on a Friday, which “surely raised fears that inability to reach a verdict that day would result in the jury’s being called in for deliberations on Saturday”; that the jury’s decision to deliberate without taking a lunch break suggests that it felt pressure to reach a verdict before the weekend; that skipping lunch “created the possibility that some jurors might cave in simply because of overwhelming feelings of hunger”; and that the jury reached a verdict only two hours after receiving the charge, which “is strongly suggestive of the coercive effect of the Allen charge.”
We have affirmed Allen charges in more stringent circumstances than those here. In United States v. Betancourt, 427 F.2d 851, 854 (5th Cir.1970), we affirmed a charge where the trial had begun at 9 a.m. on the day of the verdict, the jury did not receive the case until 6:13 p.m., it reported itself deadlocked at 8:19 p.m., and it returned its verdict at 10:23 p.m. on a stormy night. In United States v. Bottom, 638 F.2d 781, 788 (5th Cir. Unit B Mar. 1981), we affirmed an Allen charge, explaining: “The jury deliberated another three hours after the ‘Allen’ charge was given from 9:56 A.M. to 1:40 P.M., not an unduly short amount of time. The time of the day was not late. The day was not Friday or the day before a holiday. The *518 weather was not alleged to be inclement.” Here, although the district court gave the charge on a Friday, it was not late in the day or close to a holiday, and the jury deliberated for about two-and-a-half hours after receiving the charge. The timing here also presented less potential for coer-civeness than it did in Betancourt. Cf. Montalvo, 495 Fed.Appx. at 393-94 (rejecting challenge to Allen charge that jury received less than four days before Christmas because it was not issued on the day before a holiday; there was no indication that the jury expressed concern about, or that the judge mentioned, the approaching holiday; and the circumstances that may have pressured the jury were less extreme than those in Betancourt).
Additionally, we have rejected a claim that the jury’s decision to forego a meal renders an Allen charge coercive. United States v. Reeves, 892 F.2d 1223, 1229 (5th Cir.1990). We have also rejected claims of coerciveness with similarly short and even shorter deliberation periods. See Bottom, 638 F.2d at 788 (charge given after eight hours of deliberation, verdict returned three hours after Allen charge); United States v. Scruggs, 583 F.2d 238, 241 (5th Cir.1978) (charge given after four-and-a-half hours of deliberation, verdict returned 48 minutes after charge); United States v. Bailey, 468 F.2d 652, 664-65 (5th Cir.1972) (charge given after three-and-a-half hours of deliberation, verdict returned one-and-a-half hours after charge); Andrews v. United States, 309 F.2d 127, 129 (5th Cir.1962) (charge given after one hour and five minutes of deliberation, verdict returned 25 minutes after charge). We conclude here that Andaverde-Tiñoco has not shown that the district court abused its discretion in its use of the Allen charge.
III.
Second, Andaverde-Tiñoco argues that the government improperly elicited testimony and argued to the jury that he had remained silent instead of immediately informing the agents that he had been forced to cross the river, in violation of Doyle v. Ohio, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Crucial to our ruling, Andaverde-Tiñoco did not object to the alleged Doyle violations in the district court, hence review is for plain error. See United States v. Garcia-Flores, 246 F.3d 451, 457 (5th Cir.2001). Andaverde-Tiño-co must show a forfeited error that is clear or obvious and that affects his substantial rights. Puckett 556 U.S. at 135, 129 S.Ct. 1423. If he makes such a showing, we have the discretion to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.; see also Henderson v. United States, — U.S. -, 133 S.Ct. 1121, 1130, 185 L.Ed.2d 85 (2013).
A.
Under the first and second prongs of plain error review, we inquire whether there was an error that was clear or obvious. As a threshold matter, the government argues that “the vast state of the evidence was that Andaverde was not read his [Miranda ] rights until he arrived at the Border Patrol station.” As such, the government contends that commentary on Andaverde-Tiñoeo’s silence during the ride to the station could not have violated Doyle. To support its argument, the government attempts to explain the following exchange' between the prosecutor and An-daverde-Tiñoco on cross-examination:

Cross-Examination of Andaverde-Tiñoco by Prosecutor

Q: But you said when Border Patrol arrived you hunkered down in the field, right?
A: Yes, yes.
*519 Q: And you hunkered down so they wouldn’t see you, didn’t you?
A: Yes.
Q: And they handcuffed you, didn’t they?
A: Yes.
Q: And they read you your rights in Spanish?
A: Yes.
Q: And they placed you in the back of a vehicle?
A: Yes.
The government claims that the prosecutor “simply made a mistake” when asking this question and that the question did not differentiate between the field and the station, so Andaverde-Tiñoco’s answer was “technically correct.”
This argument is unpersuasive. There is no dispute in the existing record over whether the agents read Andaverde-Tiño-co his rights in the field. There is no evidence beyond the government’s ipse dixit that the prosecutor made a mistake, and the context of the question belies the government’s claim. The question came in chronological order after a question about Andaverde-Tiñoco’s behavior in the field and before a question about his ride to the station. The only persuasive reading of this testimony and exchange is that the agents read Andaverde-Tiñoco his rights in the field. Nothing in the record contradicts that (even Agent Hernandez’s affirmative testimony that he read Andaverde-Tiñoco his rights at the station) because the prosecutor never confirmed with the agents themselves, testifying at trial, if they read the rights in the field. We credit the trial record that the agents read Andaverde-Tiñoco his rights in the field.
Having testified to that Miranda factual predicate, Andaverde-Tiñoco asserts that there were five Doyle violations that occurred during his trial. We set them out below and highlight the alleged violations in italics.

Alleged Violation 1: Cross-Examination of Agent Granado by Defense Counsel

Q: Now, once you knew that another— a person among these four people was being prosecuted, did you feel it’s your duty as a[sic] officer for Border Patrol to report to someone that some people had claimed having been victimized before they crossed?
A: Yes. But it was not the defendant that made that statement, so, therefore, for me, that would be hearsay, and no, I did not make that statement to anybody else.

Alleged Violation 2: Redirect Examination of Agent Granado by Government

Q: You say there’s only one that — only one of the agent — aliens mentioned anything about being beaten and robbed?
A: That is correct.
Q: The other three were there, obviously, in the back of the vehicle, correct?
A: Yes, sir.

Q: And none of them said anything about it at the time?

A: No, sir.

Q: That would include the defendant?

A: That is correct.

Alleged Violation S: Cross-Examination of Andaverde-Tiñoco

Q: At no point did you ever tell any of the agents that you had been robbed on the other side, did you, up until the point that you were at the Border Patrol station like you’re saying?

A: That’s right, until I was at the Immigration office.

*520
Q: And when they found you in the field, you didn’t go running to them at all saying, “Oh help. I need your help. Someone on the other side wants to get me, ” did you?

A: No.
Alleged Violation A Government’s Closing Argument
When they saw the lights of the Border Patrol vehicles, they laid down and hid. They didn’t run up to them and say, “Thank God you’re here. We needed some help. We got robbed.” No, they hid. When the agents shined their flashlights on them, they ran.
So what did the defendant do after he actually got caught here and put in the Border Patrol vehicle? He starts joking with the agent. He doesn’t say anything about the alleged robbery.
One of the other aliens that was in the vehicle, he took the opportunity to make some sort of claim of a robbery. Didn’t say when or where really, but he made a claim. The defendant was right there. He said nothing.

Alleged Violation 5: Government’s Rebuttal Argument

Two Border Patrol agents were dispatched out to the scene, and when they were dispatched out to the scene, the defendant hid. They arrested him. They put him in the back of their vehicle, and he never once said anything to them about being forced. That was another person.
Under Doyle, 426 U.S. at 619, 96 S.Ct. 2240, and its progeny, “the use for impeachment purposes of [a defendant’s] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause.” “A prosecutor’s or witness’s remarks constitute comment on a defendant’s silence if the manifest intent was to comment on the defendant’s silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark.” United States v. Carter, 953 F.2d 1449, 1464 (5th Cir.1992) (citation omitted). However, the Court in Doyle made clear that the government could use a defendant’s post-Miranda silence to challenge a defendant who testifies to an exculpatory version of events and claims to have told the police that version following arrest. Doyle, 426 U.S. at 619 n. 11, 96 S.Ct. 2240. “We, and other circuits, have continued to recognize this ‘open the door’ or ‘reply’ exception to Doyle.” United States v. Martinez-Larraga, 517 F.3d 258, 268 (5th Cir.2008) (citations omitted); see also United States v. Rodriguez, 260 F.3d 416, 421 (5th Cir.2001).
At the same time, the “open the door” exception does not afford the government free reign to invoke the defendant’s post-arrest silence. “Although the government may use a defendant’s post-arrest silence to impeach testimony about the circumstances of an arrest, the government may not then argue that the defendant’s silence was inconsistent with his claim of innocence.” Rodriguez, 260 F.3d at 421 (citations omitted). In other words, the government may not ask the jury to “infer ... guilt directly from ... post-arrest silence.” Id. When the impeachment exception is not met, the Doyle test “is strict; virtually any description of a defendant’s silence following arrest and a Miranda warning will constitute a Doyle violation.” United States v. Shaw, 701 F.2d 367, 382 (5th Cir.1983); see also United States v. Edwards, 576 F.2d 1152, 1155 (5th Cir.1978).
Granado’s statement on cross-examination by defense counsel did not violate Doyle. The “manifest intent” of Gra- *521 nado’s response was not to comment on Andaverde-Tiñoco’s post-Miranda silence in a way that improperly inferred his guilt. See Carter, 953 F.2d at 1464; see also United States v. Clark-Gonzalez, 530 Fed.Appx. 372, 380 (5th Cir.2013) (unpublished) (declining to find a Doyle error where, among other reasons, the witness’s comment was elicited not by the prosecution but by defense counsel); United States v. Moreno, 185 F.3d 465, 472 (5th Cir.1999) (stating that, in assessing a Doyle violation, the court seeks “to determine whether the remark was a spontaneous comment by the witness or a comment prompted by the prosecutor”). Granado’s statement, heard by the jury before any reference to Andaverde-Tiñoco’s being given Miranda warnings in the field, was not prompted by the prosecutor but by defense counsel on cross-examination, and it is best read as a response to a question about why Granado did not report the statement of someone other than Andaverde-Tiñoco.
Likewise, the prosecutor’s redirect of Granado did not violate Doyle. Defense counsel’s opening statement implying that Andaverde-Tiñoco had immediately informed the agents of his exculpatory story opened the door to narrow permissible impeachment by the government:

Opening Argument by Defense Counsel

They’re taken to get processed, and you’re going to hear from agents of the government that while they’re being taken to the Harlingen station, they talked. They talked how they were scared [sic]. They talked that they were robbed on the other side, and they talked that they were forced to cross.
This opening argument use of the plural pronoun “they” created the false impression that Andaverde-Tiñoco and his companions, collectively, promptly cooperated and told their duress story and that the agents had failed to respond. Additionally, Andaverde-Tiñoco’s cross-examination of Granado attempted to undermine his credibility precisely by suggesting that he did not report this duress story. Thus, the prosecutor’s redirect of Granado was “a permissible attempt to impeach and clarify” defense counsel’s exculpatory version of duress and hasty cooperation upon arrest. Rodriguez, 260 F.3d at 421 n. 2.
The prosecutor’s cross-examination of Andaverde-Tiñoco presents a closer question. Defense counsel, on direct examination of Andaverde-Tiñoco, first reinforced his opening argument by eliciting proof for the duress story, but then specifically elicited that Andaverde-Tiñoco himself had remained silent on the ride to the station:

Direct Examination of Andaverde-Tiñoco by Defense Counsel

Q: Did the officer seem interested to hear details about the claim your companions have made that they were forced to cross?
A: He was talking to them all along the route, but I never said anything.
Q: Why wouldn’t you have told the officer right then and there, T didn’t want to come in. ' They forced me to come in.’?
A: No, I said that at the Immigration office.
Q: So in the vehicle you didn’t tell the driver?
A: No.
On the one hand, then, the prosecutor’s subsequent questions on cross-examination may have been an attempt to clarify the tension between defense counsel’s opening statement and Andaverde-Tiñoco’s direct testimony that only his companions spoke on the way to the station. Cf. Rodriguez, 260 F.3d at 419-420, 421 n. 2 (finding cross-examination question about silence *522 permissible where it followed defendant’s direct testimony that implied he had told exculpatory story during his initial interrogation). It is determinative, however, that Andaverde-Tiñoco testified that he had not said anything on the way to the station. In an abundance of caution, and because we find that the government’s statements during its closing and rebuttal arguments were clear Doyle errors, we assume for purposes of our plain error analysis that the government cross-examination of Andaverde-Tiñoco extended beyond a testing of collective cooperation to improper Doyle impeachment.
In other words, whereas the government initially took the permissible tack of impeaching Andaverde-Tiñoeo’s version of collective cooperation, the government went beyond “a permissible attempt to impeach and clarify” once Andaverde-Ti-ñoco delimited his exact version of post-arrest cooperation to his companions. Consequently, we conclude that the government improperly invoked Andaverde-Tiñoeo’s post-arrest silence in this closing-argument assertion: “So what did the defendant do after he actually got caught here and put in the Border Patrol vehicle? He starts joking with the agent. He doesn’t say anything about the alleged robbery. ... One of the other aliens that was in the vehicle, he took the opportunity to make some sort of claim of a robbery. Didn’t say when or where really, but he made a claim. The defendant was right there. He said nothing.” And the government repeated the error in rebuttal argument: “They put him in the back of their vehicle, and he never once said anything to them about being forced.” In this summation argument, the government “directly link[ed] the implausibility of the defendant’s exculpatory story to his ostensibly inconsistent post-arrest silence.” Price v. King, 714 F.2d 585, 588 (5th Cir.1983). Determinatively, again, the government did so after Andaverde-Tiñoco had testified that, unlike his companions, he had not cooperated post arrest by telling his exculpatory story on the way to the station but only later after his second Miranda warning, thus obviating the need for further proper impeachment about the time interval between the first and second Miranda warnings.
B.
Under the third prong of plain error review, we inquire whether error affected a defendant’s substantial rights. “[T]he defendant must demonstrate that the error affected the outcome of the district court proceedings.” Broussard, 669 F.3d at 553. Here, the government’s closing and rebuttal arguments used Andav-erde-Tiñoco’s silence to attack his duress defense, the only issue at trial, which resulted initially in a deadlocked jury. See United States v. Harp, 536 F.2d 601, 602-03 (5th Cir.1976) (“Because the prosecutor’s comments struck at the jugular of their story, those remarks cannot be classified as harmless.”);[2] see also United States v. Johnson, 558 F.2d 1225, 1230 (5th Cir.1977) (holding same under plain error review and finding “it likely that defendant’s expressed desire to remain silent tipped the scales for the jury”); United States v. Meneses-Davila, 580 F.2d 888, 895-96 (5th Cir.1978) (holding under plain error review that prosecution’s repeated references to defendant’s silence in a one- *523 day trial were not harmless, despite defendant’s responsive comments on silence). Even though Andaverde-Tiñoco did open the door to some exploration of his companions’ post-arrest statements, and even though Andaverde-Tiñoco waived his Miranda rights at the station, triggering trial-contested testimony about his own cooperation and duress story, we cannot say that his duress defense presented a frivolous argument that had no chance of success such that the Doyle errors did not affect the outcome of the proceedings. See Rodriguez, 260 F.3d at 422 (explaining that, in determining when a Doyle error is harmless, “[w]hen ... the prosecution directly links the implausibility of the exculpatory story to the defendant’s ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous”) (citing Meneses-Davila, 580 F.2d at 893).
C.
Under the fourth and final prong of plain eiTor review, if the appellant has shown an error that is clear or obvious and affects his substantial rights, we may exercise our discretion to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. The Supreme Court recently highlighted the importance of this fourth prong of plain error review as an independent criterion that helps guard against any potential “floodgates” of plain error corrections. Henderson 133 S.Ct. at 1130; see also United States v. Escalante-Reyes, 689 F.3d 415, 425 (5th Cir.2012) (en banc) (calling the fourth prong a “stringent” requirement and “declining to adopt a blanket rule that once prejudice is found under the [third plain error prong], the error invariably requires correction”) (internal citation and quotation marks omitted). The Court also has said that “[m]eeting all four prongs is difficult, as it should be.” Puckett, 556 U.S. at 135, 129 S.Ct. 1423 (citing United States v. Dominguez Benitez, 542 U.S. 74, 83 n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)) (internal quotation marks omitted). Importantly, the burden is on the defendant to demonstrate that the error affects the fairness, integrity, or public reputation of judicial proceedings. See Broussard, 669 F.3d at 546.
Although there is no exact test for what type of error seriously affects the fairness of judicial proceedings, recent case law in which we have addressed the fourth prong generally is instructive. In United States v. McCann, 613 F.3d 486, 503 (5th Cir.2010), we held that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings where the district court relied solely on the pre-sentence investigation report to conclude that the defendant’s prior manslaughter conviction constituted a “crime of violence” for purposes of sentencing, even though the government admitted that all of the documents that could have conclusively demonstrated the specific facts of the defendant’s manslaughter offense were lost in Hurricane Katrina. In Escalante-Reyes, 689 F.3d at 425-26 (internal quotation marks and citation omitted), we found that the district court’s reliance on an anger-management justification in increasing the defendant’s sentence directly controverted “Congress’s express admonition that imprisonment is not an appropriate means of promoting correction and rehabilitation” and thus affected the fairness of the proceedings and required reversal. Conversely, in United States v. Reyna, 358 F.3d 344, 352-53 (5th Cir.2004) (en banc), we found that the denial of a right to allocute at the defendant’s third sentencing hearing did not affect the fairness, integrity, or public reputation of judicial proceedings, even though it otherwise met the first three prongs, because the defendant had *524 been given the right to allocute at his original sentencing hearing and at his second sentencing hearing, where he was warned that he would be sent back to prison for twelve months if he violated the terms of his supervised release. As a final example, in United States v. Seale, 600 F.3d 473, 490 (5th Cir.2010) (en banc), we declined to exercise our discretion to correct the district court’s error in failing to exclude the defendant’s statement under Miranda because the government had presented other strong evidence of guilt, it had been the defendant’s primary responsibility to persuade the court to exclude the statement, and no miscarriage of justice would occur.
Cognizant that fourth-prong assessments trigger no precise formula, we hold that Andaverde-Tiñoeo has not met his burden of showing that the Doyle violations we identify rise to the level of error that seriously affects the fairness, integrity, or public reputation of judicial proceedings. First, Andaverde-Tiñoeo undercut any Doyle claim in his own opening argument asserting collective cooperation upon arrest. Second, Andaverde-Tiñoeo reinforced that impression of collective cooperation through his cross-examination probing of Granado, who only responsively commented on Andaverde-Tiñoco’s silence. Third, the government’s violative summation was based on Andaverde-Tiñoco’s own frank direct-examination acknowledgement that he did not tell “the officer right then and there, T didn’t want to come in. They forced me to come in.’” In other words, Andaverde-Tiñoeo not only proffered in his opening statement his duress defense through alleged collective cooperation with law enforcement, but also then on direct examination highlighted to the jury that he had not told the officers his exculpatory story immediately. In this way, Andav-erde-Tiñoco himself drew evidentiary focus on the inconsistency between his post-arrest silence and his duress defense. The government’s subsequent cross-examination and summation were cumulative of evidence affirmatively given to the jury by Andaverde-Tiñoeo. Finally, Andaverde-Tiñoeo did not perceive or object to any of these exchanges or arguments as a Doyle violation, even in a new trial motion pursuant to Federal Rule of Criminal Procedure 33. See Henderson, 133 S.Ct. at 1130 (explaining that, when courts apply prongs three and four of plain error review, “the fact that a defendant did not object, despite unsettled law, may well count against the grant of Rule 52(b) relief”). We cannot emphasize enough the importance of such prompt intercession, allowing, inter alia, a sustained objection, curative instructions, juror voir dire, and especially isolation of any error and avoidance of it in closing arguments.
Although, for the foregoing reasons, we decline to exercise plain error discretion to correct the Doyle errors we particularize, this case highlights the risks for the prosecution if it chooses to comment on a defendant’s silence after Miranda warnings, even in cases, like this one, where a defense opening implies post-arrest cooperation, where the defense then probes and makes central the cooperation story, where no Doyle objection is interposed at trial, and where, indeed, a defendant himself highlights to the jury as an incongruity his post-arrest silence. See Edwards, 576 F.2d at 1155; cf. Wainwright v. Greenfield, 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (noting that questions regarding the defendant’s behavior at the time of his arrest might be permissible if “carefully framed” to “avoid[ ] any mention of the defendant’s exercise of his constitu *525 tional rights”).[3]
rv.
Third, Andaverde-Tiñoco argues that at sentencing the district court erred in refusing to accept the affidavit of Daniel Reyna Flores, one of Andaverde-Tiñoeo’s companions who entered the United States with him. The affidavit corroborated the claim that the men were forced to cross the river, and Andaverde-Tiñoco offered it to support his request for a downward departure based on his claim of duress. The government objected. The district court refused to accept the affidavit on the ground that it contained hearsay, but allowed Andaverde-Tiñoco to call the investigator who obtained the affidavit to summarize Reyna Flores’s statements, including that he had been forced across the river. Andaverde-Tiñoco argues that the district court erred in excluding the affidavit as hearsay because the rules of evidence are not applicable in sentencing proceedings. The government argues that the district court was exercising its discretion as to admissibility and simply was not persuaded that the affidavit was rehable.
A district court has wide discretion to decide what evidence to consider or credit at sentencing. United States v. Cantu-Ramirez, 669 F.3d 619, 628 (5th Cir.), cert. denied, — U.S. -, 132 S.Ct. 2759, 183 L.Ed.2d 628, and cert. denied, - U.S. -, 133 S.Ct. 247, 184 L.Ed.2d 131 (2012). We review the decision to reject sentencing evidence for abuse of discretion. See United States v. Mitchell, 366 F.3d 376, 379 (5th Cir.2004). At sentencing, a district court “may consider any relevant evidence without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy.” United States v. Ramirez, 367 F.3d 274, 277 (5th Cir.2004). Even uncorroborated hearsay evidence may be sufficiently reliable for use at sentencing. See United States v. Gaytan, 74 F.3d 545, 558 (5th Cir.1996). Thus, to the extent that the district court thought itself obligated to exclude the affidavit as hearsay, it relied on an erroneous conclusion of law. Id.; see also United States v. Jones, 664 F.3d 966, 981 (5th Cir.2011) (“[I]t is an abuse of discretion to rely on erroneous conclusions of law.”) (internal citation and quotation marks omitted), cert. denied, — U.S. -, 132 S.Ct. 2728, 183 L.Ed.2d 70 (2012). In excluding the affidavit, the district court stated:
Well, I consider a document like that hearsay. So why — if it’s being offered for the truth of the matter asserted, why should I accept it ... as evidence ... ? [A] person who was involved ... in events leading up to an arrest of ... a person later charged would be prevented from testifying to anything that would be hearsay unless it was an exeep *526 tion. I find no exception in this case, so the objection is sustained.
Though the record is not conclusive, it appears that the district court erroneously did feel obligated to exclude the affidavit as hearsay evidence.
Even if the district court did abuse its discretion, however, any error was harmless. To determine whether an error was harmless, we inquire whether the defendant suffered prejudice from the error. Reyna, 358 F.3d at 348; see also United States v. Meza, 701 F.3d 411, 425 (5th Cir.2012). The district court allowed the investigator who obtained the affidavit to testify as to some of the statements Reyna Flores made to him. The district court noted that it afforded some “leeway” with the investigator’s testimony and allowed him to testify, over the government’s objection, as to Reyna Flores’s statements that they had been forced to cross the river and that Reyna Flores had feared for his life when they crossed. The district court concluded that it did not believe either Reyna Flores’s statements or Andaverde-Tifioco’s duress claim, in part due to the lack of corroborating evidence. Because the district court heard and considered the investigator’s testimony about the relevant portions of the affidavit, including the claim that the companions were forced to cross the border, we hold that any error in failing to admit the affidavit was harmless.
V.
Fourth, Andaverde-Tiñoco argues that if we vacate his conviction for illegal reentry, we should also vacate the revocation of his prior term of supervised release and remand for a new proceeding. Because we affirm Andaverde-Tiñoco’s conviction and sentence, we need not reach this issue.
The conviction and sentence are AFFIRMED.

. In the ill-defined posture of a "stipulated” trial, it is especially incumbent on a party to adhere to the specificity requirements of Federal Rule of Criminal Procedure 30(d). Cf. United States v. Richardson, 713 F.3d 232, 234 n. 2 (5th Cir.), cert. denied, - U.S. -, 134 S.Ct. 230, 187 L.Ed.2d 171 (2013).

. Circumstances that render Doyle error harmless have defied formulaic precision for almost half a century. See, e.g., Williams v. Zahradnick, 632 F.2d 353, 363-65 (4th Cir.1980) (stating that ''[pjerhaps more than any other circuit court, the Fifth Circuit has had occasion to rule upon the harmfulness of Doyle errors” and collecting Fifth Circuit cases).

. The dissenting opinion draws attention to several plain error outcomes we issued shortly after Doyle, almost forty years ago, especially Meneses-Davila, 580 F.2d at 895-96. Leaving aside the fact that those cases focus on harmlessness analysis and do not discuss the fourth prong as our recent case law has described it, we endorse Doyle as strongly here but perceive crucial fourth-prong distinctions. For example, in Meneses-Davila, we rejected the claim that the defendant’s references to his own silence should allow the conviction to stand because the prosecution made the first reference to the defendant’s silence at trial. Id. at 895. We then explained, “Had defendant’s statement been the first reference in the case to silence, the questioning of the agent would probably have been permissible.... [T]he defense did not initiate the comments on silence, but only responded to the prosecutor’s prior comments made during the trial.” Id.